BARKER *v.* FINLEY.

1. EQUITY—APPEAL AND ERROR—DE NOVO.

On appeal in equity proceedings, the appellate court considers the case *de novo,* and where, after considering all the advantages of the trial judge, and the presumptions arising from the personal touch he had with the case, it is satisfied that an incorrect result has been reached, whether as a matter of law or fact, its duty to reverse the court below is clear.

2. EVIDENCE—FRAUD—PROMISES—CONTRACTS.

A promise made in bad faith, with no intent to carry it out, and as a part of a scheme to defraud, may be received in evidence because it is connected with representations of fact, and its nonperformance may be proven; but, standing alone, statements promissory in their character are contractual in their nature and do not constitute fraud.

3. SPECIFIC PERFORMANCE — LAND CONTRACTS — CONSIDERATION — EVIDENCE—EQUITY.

On a bill by the vendees for the specific performance of a land contract for the sale of a house and lot, where the evidence is undisputed that a $1,000 payment, credited on the contract at the date of the making, was never paid, and, as claimed by plaintiffs, was never intended to be paid, but which defendant claims was credited with the understanding that plaintiffs' father would pay it inside of two weeks; evidence as to the conflicting claims examined, and *held,* to preponderate in favor of plaintiffs and to require reversal of the decree for defendant in the court below.

Appeal from Calhoun; North, J. Submitted January 25, 1918. (Docket No. 107.) Decided March 27, 1918.

Bill by Shirley T. Barker and another against Agnes W. Finley for the specific performance of a land contract. Defendant filed an answer in the nature of a cross-bill asking for a reformation of the contract. From a decree dismissing the bill and granting the

prayer of the cross-bill, plaintiffs appeal. Reversed, and decree entered for plaintiffs.

*Verner W. Main* (*George W. Mechem,* of counsel), for plaintiffs.

*Stewart & Jacobs,* for defendant.

FELLOWS, J. In the spring of 1910, Martin V. Barker and his wife, Harriet, the father and mother of plaintiffs, were occupying a house in the city of Battle Creek owned by one Lycurgus McCoy, spoken of in the record and briefs as Elder McCoy. Of their children, three at least were of age, Lincoln, Lulu, and Shirley. Lincoln was then a teacher in the high school at Battle Creek, Lulu was a nurse, and Shirley was attending college at Olivet. Mr. McCoy at that time owned two houses, the one then occupied by the Barkers, the other, the premises in question. He desired to remodel the one occupied by them for his own use, and to dispose of the other one. The facts preceding the execution of the papers are in dispute, but the documentary evidence shows that on May 23, 1910, Mr. McCoy executed to defendant a deed of the premises, and on May 25th she entered into a contract with Lincoln, Lulu, and Shirley Barker to sell them the premises on monthly payments. Later, and before the filing of this bill, Lincoln assigned his interest in this contract to his brother and sister. Early in the life of the contract the monthly payments were promptly made; later, not so promptly, but forfeiture was not declared. Mr. McCoy sold the premises to defendant for $4,000. The land contract recited $5,000 as the purchase price and payment of $1,000 was acknowledged therein by the defendant. Shortly before filing this bill plaintiffs made arrangements to pay the balance due on this contract and requested a statement of the amount due. A computation was furnished to which we shall refer

later, and shortly thereafter they were informed of defendant's claim that she should insist on the payment of the $1,000 mentioned in the contract but which had not actually been paid. We are satisfied that this is the first information they had that defendant claimed the purchase price was actually $5,000, and that they owed $1,000 in addition to the amount provided for in the contract. They tendered the amount due on the contract according to its terms, and, upon its refusal, filed this bill for specific performance. Defendant answered and by way of cross-bill asked to reform the contract by striking out the acknowledgment of the receipt of the thousand dollars, on the grounds of fraud. The trial court dismissed the bill and granted defendant the relief prayed. Plaintiffs appeal.

We recognize, as contended by defendant, that the trial judge had the opportunity of seeing the witnesses, of noting their appearance on the stand, their candor, or want of candor, and that his conclusions as to the facts should be given due weight. No doubt this should be taken into consideration by the appellate court; but this court is considering the case *de novo*, and where, after considering all the advantages of the trial judge, and the presumptions arising from the personal touch he had with the case, we are satisfied that an incorrect result has been reached, whether as matter of law or of fact, our duty is clear.

In the instant case the preliminary question of fact is not in dispute. Both sides agree that the thousand dollars acknowledged down payment was not in fact paid. Plaintiffs contend that no other purchase price than $4,000, the price Mr. McCoy sold the place for, was ever considered or discussed by the parties; that defendant contemplated going to California and considered a contract more salable with a substantial down payment acknowledged, and that it would also aid them

if they desired to sell the premises, and for these reasons the contract contained the provision it did. They deny that they authorized their father to act as their agent in the transaction, and insist that if there was any arrangement for a larger consideration than $4,000 it was without their authority, knowledge or consent. Defendant, on the other hand, contends that she bought this property for a speculation; that Martin V. Barker acted as agent for his children, and that he procured her to execute the contract containing the acknowledgment of payment through his fraudulent promise to, himself, pay the thousand dollars within a couple of weeks. This presents the controlling question in the case and around it the evidence, direct and circumstantial, revolves.

Mr. Barker appears to have possessed some of the traits of Dickens' famous character of Macawber; he appears to have been visionary, attempting various promotions, always expecting them to be successful, always looking for something to turn up, ready to borrow money; never realizing his ambitions, never successful, never discharging his obligations so far as defendant was concerned. At the time of this transaction she held a mortgage on the farm, which stood in Mrs. Barker's name, of $2,000 and unsecured obligations of Mr. Barker of over $2,000 more, all of which was long past due. Defendant in her testimony claims to have then had unbounded confidence in Mr. Barker, and to have accepted his unsecured promise, to pay $1,000 in a couple of weeks' time. Her case on her cross-bill is sustained by her own testimony, and some inferences that are in the case, but which are not in any way conclusive, as we view the case. On the other hand, plaintiffs' testimony is strongly corroborated by members of the family and by disinterested witnesses, who, so far as the record discloses, are absolutely unbiased.

Elder McCoy, who sold the property to defendant, and who had many conversations with her about its sale to the Barker children, was called as a witness for the plaintiffs. Under the circumstances of the case his testimony is of unusual importance. On direct examination he testified:

"Q. Did she tell you what she was selling to the Barkers for? What price?

"A. Why, I understood it was the same price that she paid me.

"Q. What was that price?

"A. $4,000."

Upon cross-examination he says:

"The question that particularly concerned Mrs. Finley that she came to talk with me about was if it would be advisable to sell to these parties, as they had no amount of money to pay down on the property, and it was stringing it out a long time, so she hesitated some time upon that question as to their ability or the advisability of selling to them on such a length of time. * * * I never heard that there was any dispute as to the consideration or any contention as to the matter, until this suit was brought."

In reply to a question by the court, he said:

"At the same time, Mrs. Finley seemed quite desirous of helping the family, and assisting them in any way she could, providing she was perfectly secure; her money would be out at interest and she would rely on it."

And upon re-examination he testified:

"Yes, she expressed herself as having sympathy for Mrs. Barker, that they had an interesting family and they now had a prospect or hoped to have a permanent home; they had been living in rented property for a long time and she said, 'Now you may think it is a foolish thing to do to sell them the property and give them a long time to pay for it, but I will be glad to do it if it can be safely done. I am willing to trust them for it.' I told her I thought it would be an ad-

visable thing to do; I had confidence in the children that they would be active and industrious in making the payments."

This witness also testifies that in these conversations the defendant told him of Martin V. Barker's past-due obligations, her unsatisfactory dealings with him, and expressed herself freely that she did not think he would or could meet his contracts.

Mrs. Rowell, a confidential friend of defendant, gave testimony that defendant told her of this sale to the Barker children; that in the early conversations she stated the consideration to be $4,000, but in the later conversations had claimed an additional $1,000. She testified:

"In the early conversation she gave me to understand that—and so stated—it was $4,000. * * * In those former conversations, she did not say anything about the real consideration being more than $4,000. She made the statement to me that she thought she had sold the property too cheaply. During all of these former conversations she told me the purchase price was $4,000. She told me that she considered that too cheap. The time when she first spoke about the claimed $1,000 was less than 6 months ago. I couldn't just say how long it is. It was recently."

Plaintiffs' mother corroborated their claim, and Lincoln, who had assigned his interest in the contract to them and who therefore had no pecuniary interest in the case, testified unequivocally that the contract price was $4,000; that she stated that her dealings with his father had been unsatisfactory, that the children were more practical than he was, that she considered him very impractical and regretted that his mother at her age was not settled in a home where she could stay. Of this witness the court in his opinion said:

"I feel it my duty to place in the record in this case that Lincoln Barker, who appeared as a witness for the plaintiffs impressed me as being an honest and conscientious witness."

But concluded that he was mistaken as to having had the conversations with defendant he testified he did have. All of this testimony was flatly contradicted by the defendant.

We have referred to a computation of the amount due on this contract obtained from defendant by plaintiffs prior to filing this bill. This computation was figured in accordance with the terms of the contract and did not include as due or owing the thousand dollars in controversy. The failure to include this sum is a significant fact and is explained by defendant with some plausibility. It is also significant that while defendant is now asking a reformation of the contract so as to collect the thousand dollars from these plaintiffs and out of this property, she stated to the man who made the computation that she was looking to Martin V. Barker for this sum.

A promise made in bad faith, with no intent to carry it out, and as a part of a scheme to defraud, may be received in evidence because it is connected with representations of fact, and its nonperformance may be proven. *McDonald* v. *Smith*, 139 Mich. 211, 218; but, standing alone, statements promissory in their character are contractual in their nature and do not constitute fraud. *Boston Piano & Music Co.* v. *Pontiac Clothing Co.*, 199 Mich. 141, and cases there cited. We doubt upon this record that we would be justified in finding that if Mr. Barker did make any promise to defendant to pay $1,000, it was made in bad faith, or that she relied upon it.

For over six years these plaintiffs have been making payments on this contract and have paid taxes, insurance, and repairs, with no notice or claim on the part of defendant that there was $1,000 more due on the contract than it showed upon its face. It was but shortly before this bill was filed that they had any knowledge of such claim. One defrauded must act promptly on

discovering the fraud. If we should treat Mr. Barker's unfulfilled promise as a fraud, and concede all defendant claims for it, both as matter of fact and of law, still defendant knew within two weeks from the execution of the contract that it was not carried out, and for over six years she accepted payments and gave no notice to the plaintiffs of her claim that she had been defrauded, took no steps to have the contract reformed until brought into court as a defendant in a bill for specific performance. Equity requires vigilance, some degree of promptness upon the part of those claiming to have been defrauded; and especially is this true where innocent parties are dealing and assuming positions in reliance upon the validity of contracts.

The evidence in this case strongly preponderates in favor of the plaintiffs and the claim they assert. We are convinced that defendant purchased these premises of Mr. McCoy for the purpose of a resale to the Barker children; that she was prompted to do this by her kindly feelings, rather than a desire to speculate; that she was then satisfied with seven per cent. interest on the money invested; that, being assured the return of her money with interest, she was willing to assist these children in securing a home for their mother and themselves.

It follows that the decree of the court below must be reversed and one here entered in conformity with the prayer of the bill. Plaintiffs will recover costs of both courts.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, and STONE, JJ., concurred. KUHN, J., did not sit.